IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| **CHARLYN PARKER,** | CASE NO. 3:19 CV 665 |
| Plaintiff, | |
| v. | JUDGE JAMES R. KNEPP II |
| **OTTAWA COUNTY, et al.,** | **MEMORANDUM OPINION AND ORDER** |
| Defendants. | |

### INTRODUCTION

Plaintiff Charlyn Parker filed an amended complaint as personal representative of the estate of Krista Mitchell. (Doc. 4). Plaintiff brings four causes of action: (1) deliberate indifference to serious medical needs under 42 U.S.C. § 1983 and 42 U.S.C. § 1988 against Defendant-Correctional Officers Matthew Crone, Amy Pugh, and A. O'Connell; (2) *Monell* pattern and practice liability under 42 U.S.C. § 1983 and 42 U.S.C. § 1988 against Defendants Ottawa County and Sheriff Stephen J. Levorchick; (3) willful, wanton, or reckless conduct under Ohio Revised Code § 2744.03(A)(6) against Defendants Levorchick, Crone, Pugh, and O'Connell; and (4) wrongful death under Ohio Revised Code § 2125 against Defendants Levorchick, Crone, Pugh, and O'Connell. *Id.* Jurisdiction is proper in this Court under 28 U.S.C. §§ 1331, 1343(a)(4) and 1367. Currently pending before this Court is Defendants' Motion for Summary Judgment (Doc. 42), to which Plaintiff responded (Doc. 47) and Defendants replied (Doc. 51). The Court invited supplemental briefing to address the recent relevant Sixth Circuit precedent. (Doc. 52). Both parties filed supplemental briefs on February 15, 2022. (Docs. 53, 54). For the reasons stated below, Defendants' motion is granted.

**BACKGROUND**

This case stems from the suicide of the decedent, Krista Mitchell, while she was held in pre-trial custody at the Ottawa County Jail in March 2017. On March 19, 2017, Mitchell was arrested in Sandusky, Ohio on outstanding warrants for "Driving Under Suspicion, Speed, Drug Paraphernalia, and Possession of Drugs". (Doc. 38-1, at 1). At booking, jail officials performed a suicide and mental health screening on Mitchell. (Doc. 37-1). On the inmate suicide prevention form, Mitchell indicated she was not thinking about killing herself, had not attempted suicide previously, and did not feel that "there [was] nothing to look forward to in the future." *Id*. The transporting officer did not believe she was a suicide risk. *Id*. The form also reported Mitchell did not show signs of depression, was not acting or talking in a strange manner, and was not incoherent or showing signs of withdrawal or mental illness. *Id*.

A correctional officer completed an inmate classification form for Mitchell. (Doc. 47-3, at 2). She marked that Mitchell did not have any current serious medical or mental health issues. *Id*. Mitchell said she had been previously treated for drug addiction, she did not believe she was an addict. *Id*. And although Mitchell said she was interested in A.A., Firelands, and Bayshore counseling programs, Mitchell did not feel she needed to see a mental health counselor immediately. *Id*.

Finally, Deputy Amy Pugh completed an inmate medical questions form for Mitchell. (Doc. 47-4). The form again confirmed Mitchell was not exhibiting visible signs of alcohol or drug withdrawal and did not appear "disoriented or confused as to suggest the risk of suicide." *Id*.

Defendant Pugh was involved in the booking process with two non-party officers (Doc. 38, at 17); Defendants Crone and O'Connell were not (Doc. 35, at 29-30; Doc. 39, at 14). After booking, the named defendants had minimal interactions with Mitchell. Before Mitchell's suicide,

2

the extent of Crone's interactions with Mitchell involved daily routine checks and delivering meals. (Doc. 35, at 69). Crone did not recall Mitchell attempting suicide or saying she wanted to commit suicide. *Id*. at 67. Pugh did not recall any interactions with Mitchell after booking. (Doc. 38, at 72). Finally, O'Connell recalled Mitchell being "upbeat . . . personable, talkative whenever we dealt with her. She was never a real issue to anybody." (Doc. 39, at 15-16).

Three days after arriving at Ottawa County Jail, Mitchell was caught with a white substance appearing to be heroin in her cell. (Doc. 47-9, at 8). Sergeant Mary Morse[1] conducted a disciplinary hearing concerning Mitchell's possession of drug contraband. *Id*. at 5. None of the named defendants were involved in this hearing. During the hearing, Morse observed Mitchell did not display any symptoms of withdrawal. (Doc. 40, at 28). After the hearing, Morse advised Mitchell to fill out a sick slip if she needed medical attention. *Id*. at 31. Morse stated Mitchell was aware of the procedure. *Id*. Morse further informed Mitchell that her lockdown status would not affect her ability to receive medical attention or counseling and Mitchell "gave every indication she understood." *Id*. at 31-32. Mitchell was placed on a 30-day lockdown as punishment. (Doc. 47-9, at 6).

During this time, Mitchell began openly discussing suicide with Stephanie Dziwik, an inmate in the cell next to hers. (Doc. 47-10, at 3). Dziwik stated Mitchell discussed suicide "four or five times." *Id.* On the day Mitchell committed suicide, Dziwik said Mitchell sang a song called "give me back my bullets" and told Dziwik she was "going crazy." *Id*. On March 27, 2017, Mitchell hanged herself with a bed sheet in her cell. *Id*.

Plaintiff alleges Mitchell's death "was the result of deliberate indifference to her medical needs by the people entrusted with providing for her safety." (Doc. 4, at 6). Plaintiff also claims

---

1. Sergeant Morse is not a named party to this action.

3

Defendants Pugh, O'Connell, and Crone were all on actual notice of Mitchell's suicidal tendencies and, due to policy customs and practices, Ottawa County and Levorchick, "showed a callous deliberate indifference to her serious medical needs." *Id*. at 6-7.

## STANDARD OF REVIEW

Summary judgment is appropriate when the evidence shows there is "no genuine dispute as to material fact" and the moving party "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When deciding a motion for summary judgment, the Court must consider all underlying facts "in the light most favorable to the party opposing the motion." *Matushita Elec. Indus. Co. v. Zenith Radio Corp.*, 457 U.S. 574, 587 (1986). The Court cannot weigh the evidence or determine the truth of the disputed matter and must determine only whether there is sufficient evidence for a jury to find in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The moving party bears the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

## DISCUSSION

Plaintiff brings claims of deliberate indifference to serious medical needs, *Monell* pattern and practice liability, and state law tort claims. Defendants move for summary judgment as to each claim. Each will be discussed in turn.

<u>Deliberate Indifference to Serious Medical Needs</u>

Plaintiff first alleges Defendants Crone, O'Connell, and Pugh violated Mitchell's constitutional right to have serious medical needs attended to by allegedly disregarding a known

risk of suicide. (Doc. 4, at 7). In response, Defendants have raised the affirmative defense of qualified immunity. (Doc. 42, at 15).

Government officials acting in their official capacity are entitled to qualified immunity for discretionary acts which do not violate clearly established law of which a reasonable person would have known. *Comstock v. McCrary*, 273 F.3d 693, 701 (6th Cir. 2001). When considering whether qualified immunity applies, the Court must determine whether defendants violated a constitutional right and whether that right was clearly established at the time of violation. *Dominguez v. Corr. Med. Servs.*, 555 F.3d 543, 549 (6th Cir. 2009). If either cannot be shown, qualified immunity applies, and the case must be dismissed. *Aldini v. Johnson*, 609 F.3d 858, 863 (6th Cir. 2010).

The Eighth Amendment prohibits cruel and unusual punishments, U.S. Const. amend. VIII, and "includes a right to be free from deliberate indifference to an inmate's serious medical needs", *Brawner v. Scott Cty.*, 14 F. 4th 585, 591 (6th Cir. 2021). "But the Eighth Amendment does not apply to pretrial detainees" like Plaintiff who "[i]nstead . . . have a constitutional right to be free from deliberate indifference to serious medical needs under the Due Process Clause of the Fourteenth Amendment." *Greene v. Crawford Cty.*, 22 F.4th 593, 605 (6th Cir. 2022). As a pretrial detainee, Plaintiff's "due process rights to medical care 'are at least as great as the Eighth Amendment protections available to a convicted prisoner.'" *Griffith v. Franklin Cty*, 975 F.3d 554, 566 (6th Cir. 2020) (quoting *City of Revere v. Mass Gen. Hosp.*, 463 U.S. 239, 244 (1983)).

Until recently, Fourteenth Amendment pretrial detainee claims and Eighth Amendment deliberate indifference claims were analyzed "under the same rubric". *Brawner*, 14 F. 4th at 591 (internal quotation and citation omitted). The Eighth Amendment framework for deliberate indifference claims includes an objective and subjective component. *Griffith*, 975 F.3d at 566. "The objective component requires a plaintiff to prove that the alleged deprivation of medical care

5

was serious enough to violate the [Constitution]." *Id.* at 567 (quoting *Rhinehart v. Scutt*, 894 F.3d 721, 737 (6th Cir. 2018)). The subjective component requires a plaintiff to show that "each defendant subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk by failing to take reasonable measures to abate it." *Id.* at 568 (quoting *Rhinehart*, 894 F.3d at 738). This is a high standard of culpability, "equivalent to criminal recklessness." *Id.*

The Sixth Circuit's majority opinion in *Brawner*, 14 F.4th 585, "changed things." *Greene*, 22 F. 4th at 606. There, relying on the Supreme Court's decision in *Kingsley v. Hendrickson*, 576 U.S. 389 (2015) – an excessive force claim involving a pretrial detainee – the Sixth Circuit found that "*Kingsley*'s reasoning required 'modification of the subjective prong of the deliberate-indifference test for pretrial detainees.'" *Id.* (quoting *Brawner*, 14 F.4th at 596). Therefore, the Court held to satisfy the "subjective prong" of a deliberate indifference claim, "[a] pretrial detainee must prove 'more than negligence but less than subjective intent—something akin to reckless disregard.'" *Brawner*, 14 F.4th at 597 (quoting *Castro v. County of Los Angeles*, 833 F.3d 1060, 1071 (9th Cir. 2016) (en banc)). "In other words, a plaintiff must prove the defendant acted 'deliberately, not accidentally, [and] also recklessly in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known.'" *Greene*, 22 F. 4th at 606 (quoting *Brawner*, 14 F.4th at 597).

Therefore, to survive summary judgment on a deliberate indifference claim, Plaintiff must "present evidence from which a reasonable jury could find that (1) that [the detainee] had an objectively serious medical need; and (2) that [the defendant's] action (or lack of action) was intentional (not accidental) and she either (a) acted intentionally to ignore [the detainee's] serious medical need, or (b) recklessly failed to act reasonably to mitigate the risk the serious medical need

6

posed to" the detainee. *Brawner*, 14 F.4th at 597. The Court "cannot 'impute knowledge from one defendant to another[,]' [rather it] must 'evaluate each defendant individually[.]'" *Greene*, 22 F. 4th at 607 (quoting *Speers v. County of Berrien*, 196 F. App'x 390, 394 (6th Cir. 2006)).[2]

The proper inquiry for a jail suicide § 1983 case is whether the decedent showed an objectively serious medical need "in a manner such that failure to take adequate precautions amounted to deliberate indifference of serious medical needs." *Barber v. City of Salem*, 953 F.2d 232, 239-40 (6th Cir. 1992). Plaintiff must therefore show (1) Mitchell demonstrated a strong likelihood of taking her own life and (2) Defendants acted with deliberate indifference to such threat. *David v. Fentress Cty.*, 6 F. App'x 243, 249 (6th Cir. 2001). A showing of negligence is insufficient. *Id*.

Plaintiff will have demonstrated a strong likelihood of suicide if the suicide was "clearly foreseeable." *Gray v. City of Detroit*, 399 F.3d 612, 616 (6th Cir. 2005). Normal unhappiness does not establish a strong likelihood to commit suicide. The Sixth Circuit has considered several risk factors indicating a "strong likelihood" of suicide, including: (1) a history of alcohol and substance abuse, (2) feelings of hopelessness, (3) impulsive or aggressive tendencies, (4) isolation, (5) access to methods for suicide, (6) a history of mental illness, particularly clinical depression, and (7) prior traumatic brain injuries. *Troutman v. Louisville Metro Dep't of Corr.*, 979 F.3d 472, 484 (6th Cir. 2020). Additionally, a strong likelihood of suicide generally requires evidence that the inmate was already on suicide watch, had previously attempted suicide under comparable conditions, or had recently indicated a desire to self-harm. *Downard for Est. of Downard v. Martin*, 968 F.3d 594 (6th Cir. 2020).

---

[2] In light of this recent change, the Court sought - and the parties submitted – supplemental briefing.

7

Viewing the evidence in the light most favorable to Plaintiff, Plaintiff has provided sufficient evidence to show Mitchell's psychological needs and suicidal tendencies were objectively serious medical needs. To start, Mitchell struggled with a history of substance abuse. She had abused heroin for at least seven years prior to her death. (Doc. 34, at 61). Mitchell further informed Sergeant Morse she was a drug addict during her disciplinary hearing. (Doc. 40, at 26). Mitchell was also struggling with feelings of hopelessness. In a recorded conversation with her fiancé, Mitchell informed him "every day is like a week[,]" she wasn't sleeping or eating, and that she was "about to die." (Exhibit D7, at 51:41:45-51:56:20) (audio recording of Mitchell's visit with fiancé). Prior to the recorded visit from her fiancé, Mitchell hadn't "been out of [her] cell in days." *Id*. at 51:37:59. Mitchell also had access to methods for suicide as she hanged herself with sheets provided by the prison. (Doc. 35-1, at 1).

Plaintiff has provided evidence of several of the relevant considerations discussed in *Troutman* (history of substance abuse, feelings of hopelessness, isolation, and access to methods for suicide). *See Troutman*, 979 F.3d at 484. Plaintiff has also provided evidence that Mitchell had expressed a desire to self-harm before her death. In a letter written by Mitchell to her fiancé, Mitchell stated she was "losing [her] mind in here" and that she was considering suicide. (Doc. 47-11, at 6). Thus, Plaintiff has provided evidence of suicidal tendencies sufficient to meet the objective component.

Psychological needs manifesting themselves in suicidal tendencies are serious medical needs. *David*, 6 F. App'x at 249. As stated, Mitchell had a strong risk of committing suicide. Therefore, Mitchell was suffering from a sufficiently serious medical need. However, Plaintiff has provided insufficient evidence to show Defendants were deliberately indifferent to Mitchell's

serious medical needs. Because the Court cannot impute the knowledge of one officer to another to establish collective liability, the Court evaluates each Defendant individually.

*Defendant Crone*

Crone was not involved in booking, classifying, or assigning Mitchell. (Doc. 35, at 29). Before Mitchell's suicide, the extent of Crone's interactions with Mitchell involved daily routine checks and delivering meals. *Id*. at 69. Crone did not recall Mitchell attempting or threatening to attempt suicide. *Id*. at 67. Crone said, "[Mitchell] seemed like a normal inmate. I mean, there may have been times where she was a little, I guess you could say depressed, but inmates are that way when they're in jail . . . It [didn't] strike me as anything excessively alarming." *Id*. at 69. Plaintiff alleges this statement "hid a kernel of truth: that [Crone] observed Ms. Mitchell to be depressed and in need of help during her incarceration." (Doc. 47, at 22). However, the presence of a single factor, such as depressed mood, "coupled with the absence of any objective manifestation of suicidal ideation [to Crone], provides no basis from which a reasonable jury could conclude that [Crone] perceived a strong likelihood of suicide[.]" *Galloway v. Anuszkiewicz*, 518 F. App'x. 330, 336 (6th Cir. 2013). This concept still applies under the new standard. *See Greene*, 22 F. 4th at 614 (holding crisis services worker who assessed inmate to be "struggling with [delirium tremens]" but "[did] not appear to be [a] risk to himself" was not deliberately indifferent to the inmate's suicidal tendencies).

Plaintiff further alleges Mitchell was vocal about her suicidal ideations and the officers who frequently checked on inmates, including Crone, would have "heard these calls for help." (Doc. 47, at 23). Plaintiff points to Dziwik's statements that Mitchell said she was "going crazy" every day, and the night of her death Mitchell told Dziwik she wanted to kill herself and sang a song titled "give me back my bullets." (Doc. 47-10, at 4).

9

Dziwik told an investigator Mitchell discussed suicide four to five times. *Id*. The investigator further noted Dziwik was upset because "she had not made Mitchell's comments known to the jail staff." (Doc. 36, at 25). The investigation notes reported "no suicide talk to [correctional officers]." (Doc. 36-2). Dziwik later filed a supplemental statement describing Mitchell as "happy, [and] she was singing and joking around prior to the incident." (Doc. 36-3). Once again, Dziwik did not claim Mitchell had communicated her suicidal thoughts with officers. *Id*.

Plaintiff offers no evidence to suggest Crone acted "deliberately, (not accidentally), [and] also recklessly in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known.'" *Greene*, 22 F. 4th at 606 (quoting *Brawner*, 14 F.4th at 597).

There is likewise no evidence to suggest any such condition was communicated to Crone. Because there has been no evidence to suggest Mitchell exhibited physical symptoms or expressed suicidal thoughts to Crone, it cannot be genuinely disputed that Crone's lack of action was intentional. *Brawner*, 14 F.4th at 597. Thus, the claim that Crone acted with deliberate indifference toward Mitchell lacks factual support and summary judgment is granted.

*Defendant Pugh*

Pugh oversaw Mitchell's booking, but testified she did not specifically recall it. (Doc. 38, at 54). To her, this meant the process was not abnormal and did not raise any red flags. *Id*. at 55. Plaintiff asserts Mitchell was visibly intoxicated at booking. (Doc. 54, at 10). However, the video recording of Mitchell's booking shows that Mitchell did not appear to be suffering from any significant illness or intoxication and was able to answer all questions coherently. *See generally* Exhibit D1 (video recording of Mitchell's March 19, 2017 booking).

10

Pugh explained the booking process involved questions regarding mental health and informing the inmates that counseling services were available through Bayshore or Firelands and that they would need to sign up if they were interested. (Doc. 38, at 22). Inmates were also shown how to sign up. *Id*. If an inmate showed a general interest in counseling, the officers would instruct them to fill out an inmate request form. *Id*. at 24. If interest in counseling was urgent, the officer would call Firelands to get a counselor to speak on the phone with the inmate right away. *Id*. As evidenced, Mitchell conveyed a general interest in participating in A.A. counseling, Firelands counseling, and Bayshore counseling. (Doc. 38-2, at 1). However, when asked whether she felt the need to see a mental health counselor immediately, Mitchell responded "No." (Exhibit D1, at 20:07:12). Mitchell also reported she did not currently have a serious medical or mental health issue, denied addiction or consuming any drugs in the past 24 hours, and was not going to suffer withdrawal. (Doc. 38-2, at 1; Doc. 47-6, at 2). On the classification form, Mitchell was marked "medium security" which Pugh explained meant Mitchell "was seen as not a threat or not in there due to a serious crime or did not have any medical needs or special needs." *Id*. at 37. Mitchell did not make any other specific requests for medical assistance during booking. *See generally* Exhibit D1.

Despite disclosing she had consumed two shots of moonshine hours prior, Mitchell stated she would "probably blow a 0 [on a breathalyzer test]" and it would be "better for both of us" if the classification form did not reflect Mitchell had consumed alcohol. (Exhibit D1 at 20:41:38).

Plaintiff alleges Pugh recklessly disregarded a potentially serious medical need and heightened risk of suicide by complying with this request, constituting deliberate indifference. (Doc. 47, at 20). However, there is no evidence to suggest Pugh completed this form. Pugh testified the handwriting and Officer Unit Number contained in the classification form were not her own.

(Doc. 38, at 29). Video evidence shows the officer filling out the classification form was not Pugh. The officer appearing in the video does not match the physical characteristics of Pugh and can be heard saying "Hey, Amy [Pugh], you can do the booking." (Exhibit D1 at 20:09:07). When Mitchell arrived at the facility for booking, she did not demonstrate any signs of being under the influence. She spoke coherently and was able to converse with the officers. *See generally* Exhibit D1. Mitchell also did not make a specific request for counseling; she only expressed a general interest as a way to "get out of her pod." (Exhibit D1 at 20:07:50). Thus, Plaintiff has not shown Pugh acted "deliberately, (not accidentally), [and] also recklessly in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known.'" *Greene*, 22 F. 4th at 606 (quoting *Brawner*, 14 F.4th at 597). Pugh is entitled to summary judgment as to this claim.

*Defendant O'Connell*

O'Connell only had supervisory duties over Mitchell. (Doc. 39, at 14). Plaintiff alleges O'Connell was on actual notice of Mitchell's depression and suicidal tendencies and failed to take any steps to treat her mental health problems. (Doc. 4, at 5). However, O'Connell testified she had not heard anything regarding Mitchell's health or her request for counseling. (Doc. 39, at 15). O'Connell did not participate in Mitchell's booking or her suicide prevention screening. *Id*. at 14. O'Connell was also not involved in Mitchell's disciplinary proceedings and was unaware of why Mitchell was being disciplined. *Id*. at 16-17. During her only conversations with Mitchell while conducting supervisory checks, O'Connell said Mitchell "seemed upbeat to us. She was personable, talkative whenever we dealt with her. She was never a real issue to anybody." *Id*. at 15-16.

Plaintiff has not offered any evidence to suggest O'Connell acted deliberately and recklessly in the face of an unjustifiably high risk of harm that was either known or should have

12

been known. *Greene*, 22 F. 4th at 606 (quoting *Brawner*, 14 F.4th at 597). Thus, even viewing the facts in the light most favorable to Plaintiff, Plaintiff has not raised a genuine dispute as to this claim. Defendant O'Connell is entitled to summary judgment.

In conclusion, because there is no genuine issue of material fact as to the deliberate indifference of the individual Defendants, the Court does not need to address whether a clearly established right exists. *See Saucier v. Katz*, 533 U.S. 194, 201 (2001) ("If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity."). Thus, each individual Defendant is entitled to qualified immunity and summary judgment is granted.

*Monell* Pattern and Practice Liability

Plaintiff next alleges Ottawa County and Sherriff Levorchick are subject to liability for the actions of its agents as they were taken in accordance with their policies, practices, and customs. (Doc. 47, at 28). Plaintiff states Defendants' policies were so inadequate they constitute deliberate indifference. *Id.* at 31. Defendants argue the alleged insufficiency of the jail's policies does not constitute a constitutional violation. (Doc. 51, at 33). Defendants further argue cumulative liability is not applicable for this claim. *Id*. at 36.

A government entity can only be sued under § 1983 when the "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy" inflicts a constitutional violation.[3] *Monell v. Dep't. of Soc. Servs.*, 436 U.S. 658, 694 (1978). These violations must be a pattern of "persistent misconduct" that would

---

3. When a failure to train claim is brought against an individual acting in his official capacity, the claim "is treated as a suit against the municipality." *Doe v. Claiborne Cty.,. ex rel. Claiborne Cty. Bd. of Educ.*, 103 F.3d 495, 509 (6th Cir. 1996). Thus, the analysis of this claim against Ottawa County is identical to that against Defendant Levorchick.

13

give Defendant "the opportunity to conform to constitutional dictates[.]" *Berry v. Delaware Cty. Sheriff's Off.*, 796 F. App'x 857, 862 (6th Cir. 2019) (quoting *D'Ambrosio v. Marino*, 747 F.3d 378, 388 (6th Cir. 2014) (internal citation omitted)). The existence of an unconstitutional custom cannot be inferred from a single instance of misconduct. *Meirs v. Ottawa Cty.*, 821 F. App'x 445, 453 (6th Cir. 2020) (citing *Thomas v. City of Chattanooga*, 398 F.3d 426, 433 (6th Cir. 2005)). The policies must be the "moving force" behind the constitutional violation. *Monell*, 436 U.S. at 694.

When each individual Defendant has not committed a constitutional violation, Plaintiff cannot establish a harm for purposes of *Monell* liability. *Barber v. City of Salem*, 953 F.2d 232, 240 (6th Cir. 1992) ("[W]here no constitutional violation exists for failure to take special precautions, none exists for failure to promulgate policies and to better train personnel to detect and deter jail suicides."). Because there is no genuine dispute that each of the individual Defendants committed a constitutional violation, Defendants Ottawa County and Levorchick cannot be subjected to *Monell* liability. Summary judgment is granted as to this claim.

Even assuming, *arguendo*, Plaintiff could show constitutional violations by an individual Defendant, *Monell* liability still fails. Plaintiff first alleges Defendants' practices allowed for the failure to recognize and timely treat symptoms of narcotics withdrawal. (Doc. 4, at 8). However, Plaintiff has not offered any evidence to suggest Mitchell was experiencing withdrawal or that officers were aware of any possible symptoms. Officers were trained to look for symptoms of withdrawal such as chills, diarrhea, or headaches. During the booking process, Mitchell said she was not under the influence of any drug. (Doc. 38-2). She did not believe she was an addict and was not going to experience withdrawal during incarceration. (Exhibit D1, at 20:07:20). None of the officers noticed her experiencing symptoms of withdrawal during her incarceration. (Doc. 35,

14

at 69-70; Doc. 38-3; Doc. 39, at 15-16; Doc. 40, at 28). After a discussion with Mitchell following her disciplinary hearing, Sergeant Morse did not think Mitchell was going to experience withdrawal because Mitchell was not exhibiting any symptoms. (Doc. 40, at 28). Morse explained these symptoms are similar to a bad case of the flu. *Id*. at 29. Because Plaintiff has not offered evidence Mitchell experienced symptoms of withdrawal, a claim that Ottawa County and Sheriff Levorchick had unconstitutional policies or customs related to the recognition and treatment of narcotics withdrawal cannot survive.

Plaintiff next alleges Defendants' policies resulted in a failure to provide basic medical services. (Doc. 4, at 8-9). However, Defendants respond there was no occasion when Mitchell requested medical care and did not receive it. (Doc. 42, at 26). State mandates require a mandatory health appraisal to be conducted on all inmates within two weeks of booking. (Doc. 35, at 56); *see also* Ohio Admin. Code § 5120: 1-8-09(D)). At Ottawa County Jail, this appraisal was usually conducted within five to ten days, if not sooner. (Doc. 35, at 57). Had Mitchell needed further medical attention, Defendants had policies in place to address it. When an inmate needed further medical attention or counseling, they were to fill out a request form. *Id.* at 50. These request forms were picked up by officers during their regular checks. *Id*. at 51. Even if Mitchell was not aware of this procedure at intake, she was made aware by Sergeant Morse after her disciplinary hearing. (Doc. 40, at 31). Morse advised Mitchell to fill out a sick slip if she needed medical attention. *Id*. Morse stated Mitchell was aware of the procedure. *Id*. Morse further informed Mitchell that her lockdown status would not affect her ability to receive medical attention or counseling and Mitchell "gave every indication she understood." *Id*. at 32. Mitchell also received over-the-counter medication on several occasions. *See* Doc. 42-1, at 71-73.

15

Finally, Plaintiff alleges the policies of Defendant Ottawa County resulted in a failure to train its personnel on "proper techniques for suicide screening and prevention, and the proper response to inmates who request mental health services and/or express suicidal ideations." (Doc. 4, at 9). To bring a successful failure to train claim, Plaintiff must show "(1) the training or supervision was inadequate for the tasks performed; (2) the inadequacy was the result of the municipality's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury." *Winkler v. Madison Cty.*, 893 F.3d 877, 902 (6th Cir. 2018) (citing *Ellis ex rel. Pendergrass v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 700 (6th Cir. 2006)).

Multiple officers testified they were required to complete training regarding suicide assessment. When first hired, officers are required to read the jail's suicide prevention policy manual and pass a verbal test. (Doc. 35, at 27). Officers are also required to attend "Corrections Academy" to receive training on issues including suicide prevention. *Id*. The training instructed officers on the "different stages of how to determine whether somebody is [suicidal] or what to do if it does happen." *Id*. At the end of the training, all officers are required to pass another test. (Doc. 38, at 109-10).

Plaintiff alleges "Ottawa County's own policies were to . . . not screen or seek medical approval before an inmate was placed in [disciplinary] lockdown. As a result, pursuant to official policy, Ms. Mitchell was placed in a disciplinary lockdown with little access to the outside world, even though she had not yet been seen by medical staff for her initial physical and screening." (Doc. 47, at 34).

However, Plaintiff has not provided sufficient evidence to show the execution of the Jail's policies was the "moving force" behind a pattern of persistent misconduct. *Monell*, 436 U.S. at 694. Plaintiff has not shown any prior instances of constitutional violations related to Ottawa

16

County's suicide prevention policy. Plaintiff has also not provided evidence showing disciplinary lockdown caused other inmates to be at increased risk of suicide. Consequences of an alleged constitutionally deficient policy must be known or obvious. *MacLean-Patterson v. Erie Cty.*, 488 F. Supp. 3d 581, 589 (N.D. Ohio 2020). "A showing of simple or even heightened negligence will not suffice." *Id*. (quoting *Winkler*, 893 F.3d at 901).

Additionally, Plaintiff has provided insufficient evidence to show a direct causal link between any policy and the alleged constitutional deprivation. Plaintiff's medical expert reported that with "more robust training, access to health professionals, and access to counseling to help screen Ms. Mitchell or do more routine checks on her while she was in lockdown, her suicide could have been prevented." (Doc. 47-19, at 30). Plaintiff reiterates this point in her supplemental briefing by asking the rhetorical question "Who knows what a simple mental health assessment could have revealed or prevented?" (Doc. 54, at 15). However, as Defendants point out in their supplemental briefing (Doc. 53, at 18), even Plaintiff's expert did not testify that the policies directly caused Mitchell's suicide. *See generally* Doc. 47-24. Allegations that a suicide "could have" been prevented are insufficient since "[i]n virtually every instance where a person has had his or her constitutional rights violated by a city employee, a § 1983 plaintiff will be able to point to something the city 'could have done' to prevent the unfortunate incident." *City of Canton,v. Harris*, 489 U.S. 378, 392 (1989). Even still, Mitchell never exhibited symptoms of drug withdrawal or expressed suicidal ideations to the officers. Had she done so, the jail had policies in place to provide her assistance. *See* Doc. 47-17 (Policy A-112 (substance abuse screening and referrals policy); Policy A-114 (mental health screening and referrals policy); Policy B-100 (classification policy stating "a correction officer should initiate a Code I Suicide Watch on an

17

inmate if that inmate's current behavior or attitude demonstrates the inmate is highly likely to initiate a suicide attempt.")).

Therefore, because Plaintiff has not provided sufficient evidence to establish *Monell* liability, summary judgment is granted as to this claim.

State Law Claims

Finally, Plaintiff alleges the actions of Levorchick, Crone, Pugh, and O'Connell constituted willful, wanton, or reckless conduct under Ohio Revised Code § 2744.03(A)(6). (Doc. 4, at 9). Plaintiff also alleges wrongful death under Ohio Revised Code § 2125. *Id*. at 10. Defendants contend they are immune from the claims under Ohio Revised Code § 2744. (Doc. 42, at 28).

In Ohio, political subdivision employees are presumed to be immune from tort claims when acting within their official duties. *Burgess v. Fischer*, 735 F.3d 462, 479 (6th Cir. 2013). This immunity is eliminated when the alleged action or inaction is committed "with malice purpose, in bad faith, or in a wanton or reckless manner." Ohio Rev. Code § 2744.03(A)(6)(b).

Malice is defined as "the willful and intentional design to do injury or the intention or desire to harm another. . . through conduct which is unlawful or unjustified." *Burgess*, 735 F.3d at 479 (citing *Cook v. Cincinnati*, 103 Ohio App. 3d 80, 90 (Ohio Ct. App. 1995)). "Wanton misconduct" is defined as "the failure to exercise any care toward those to whom a duty of care is owed in circumstances in which there is a great probability that harm will result. *Id*. at 480 (citing *Anderson v. City of Massillon*, 134 Ohio St. 3d 380 (2012)). "Reckless conduct" is the "conscious disregard of or indifference to a known or obvious risk of harm . . . that is unreasonable under the circumstances and is substantially greater than negligent conduct." *Id*. For the same reasons discussed above, none of these standards are met here.

As discussed, each individual Defendant is entitled to qualified immunity to Plaintiff's federal claims because Plaintiff has failed to demonstrate a genuine issue of material fact as to a constitutional violation. When federal qualified immunity and Ohio state-law immunity under Ohio Revised Code § 2744.03(A)(6) rest on the same questions of material fact, the Court may review the state-law immunity defense "through the lens of federal qualified immunity analysis." *Wright v. City of Euclid*, 962 F.3d 852, 878 (6th Cir. 2020) (quoting *Chappell v. City of Cleveland*, 585 F.3d 901, 907 n.1 (6th Cir. 2009)).

Plaintiff has not offered any evidence to establish Defendants acted with the necessary state of mind to defeat immunity from tort claims. Because Defendants are entitled to federal qualified immunity, they are entitled to state-law immunity as well. Thus, summary judgment as to the state-law claims is also granted.

## CONCLUSION

For the foregoing reasons, good cause appearing, it is

ORDERED that Defendants' Motion for Summary Judgment (Doc. 42) be, and the same hereby is, GRANTED.

    s/ *James R. Knepp II*
UNITED STATES DISTRICT JUDGE